Paul P. Burghardt (Utah Bar No. 10795)
Outreach Legal
*Attorney for Plaintiff*
2 North Central Ave., Ste. 1800-#4501
Phoenix, Arizona 85004
Email: paul.burghardt@outreachlegal.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **Julio Santiago-Moreno**, an individual | |
| Plaintiff, | **DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CMO #3** |
| v. | |
| | MDL No.: 2873 |
| 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company; AGC CHEMICALS AMERICAS INC.; ALLSTAR FIRE EQUIPMENT; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS, INC.; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; DUPONT DE NEMOURS INC.,  f/k/a DOWDUPONT, INC.; DYNAX CORPORATION; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; | Master Docket No.: 2:25-av-55555 Civil Action No.: Judge Richard Gergel |

HONEYWELL SAFETY PRODUCTS USA,
INC.;
KIDDE-FENWAL, INC.;
KIDDE P.L.C.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY LLC;
MINE SAFETY APPLIANCES CO., INC.;
MUNICIPAL EMERGENCY SERVICES, INC.;
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS;
SOUTHERN MILLS, INC.;
STEDFAST USA, INC.;
THE CHEMOURS COMPANY FC, LLC,
individually and as successor in interest to
DuPont Chemical Solutions Enterprise;
THE CHEMOURS COMPANY,
individually and as successor in interest to
DuPont Chemical Solutions Enterprise;
TYCO FIRE PRODUCTS L.P.;
UNITED TECHNOLOGIES CORPORATION;
UTC FIRE & SECURITY
AMERICAS CORPORATION, INC.; and W.L.
GORE & ASSOCIATES INC.

## **COMPLAINT**

Plaintiff, Julio Santiago-Moreno ("Plaintiff"), by and through Plaintiff's attorneys, brings

this Complaint against: 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company;

BUCKEYE FIRE EQUIPMENT COMPANY; CHEMGUARD, INC.; TYCO FIRE PRODUCTS

L.P.; NATIONAL FOAM, INC.; E.I. DUPONT DE NEMOURS AND COMPANY, individually

and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS

COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise;

THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont

Chemical Solutions Enterprise; CORTEVA, INC.; DAIKIN AMERICA, INC.; DUPONT DE

NEMOURS INC., f/k/a DOWDUPONT, INC.; AMEREX CORPORATION; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAX CORPORATION; DEEPWATER CHEMICALS, INC.; CHUBB FIRE, LTD.; CLARIANT CORPORATION; ARCHROMA U.S., INC.; BASF CORPORATION; UNITED TECHNOLOGIES CORPORATION; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; NATION FORD CHEMICAL COMPANY; ALLSTAR FIRE EQUIPMENT; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; CHEMICALS, INC.; KIDDE-FENWAL, INC.; KIDDE P.L.C.; LION GROUP, INC.; MALLORY SAFETY AND SUPPLY LLC; MINE SAFETY APPLIANCES CO., INC.; MUNICIPAL EMERGENCY SERVICES, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, INC.; SOUTHERN MILLS, INC.; STEDFAST USA, INC.; and W.L. GORE & ASSOCIATES INC., (collectively "Defendants"), and alleges as follows:

## **NATURE OF THE ACTION**

1.     This is a civil action for compensatory and punitive damages, costs incurred and to be incurred by Plaintiff, and any other damages that the Court or jury may deem appropriate for bodily injury arising from the intentional, malicious, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with Aqueous Film-Forming Foam ("AFFF") and firefighter turnout gear ("TOG") containing Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic acid ("PFOS"). All Defendants were involved in the manufacturing, marketing, design, sale, and/or distribution of fluorochemical products, fluorosurfactants, TOG, AFFF, PFOA, PFOS, PFAS, and/or the precursors to PFOA and PFOS (collectively hereinafter "fluorochemical products" or "C8") to which Plaintiff was exposed.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction, as the Defendants have claimed, or are anticipated to claim, derivative sovereign immunity as a government contractor. See 2:18-mn-2873-RMG filings of General Denials and Preliminary Statements of Affirmative Defenses; and Boyles v. United Technologies Corp., 487 U.S. 500 (1988).

3.      Plaintiff is filing this Complaint as permitted by Case Management Order No. 3 ("CMO #3") issued by Judge Richard M. Gergel of this Court. Pursuant to CMO #3, Plaintiff designates the U.S. District Court for the Middle District of Florida as the "home venue" where Plaintiff would have otherwise filed suit pursuant to 28 U.S.C. § 1391. But for CMO #3, venue is proper in the U.S. District Court for the Middle District of Florida in that a substantial part of the events or omissions giving rise to the claim occurred in that district. Plaintiff respectfully requests that, at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the Plaintiff's "home venue."

4.      The U.S. District Court for the Middle District of Florida has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the State of Florida for active use during the course of training and firefighting activities. Therefore, the exercise of jurisdiction over the Defendants by the U.S. District Court for the Middle District of Florida does not offend traditional notions of fair play and substantial justice.

**PARTIES**

**PLAINTIFF**

5.     Plaintiff, Julio Santiago-Moreno, is a citizen of the United States of America, and a current resident of Texas.

6.     For a substantial period of time, Plaintiff was a firefighter and also served in the U.S. military.

7.     Plaintiff was exposed to Defendants' fluorochemical products at various locations during the course of Plaintiff's training, firefighting activities, military service, and/or employment.

8.     Plaintiff regularly used, and was thereby directly exposed to, AFFF, TOG, and fluorochemical products during Plaintiff's career as a firefighter when extinguishing fires and in training and drilling to extinguish fires.

9.     Plaintiff also was unknowingly exposed to Defendants' fluorochemical products during his military career as a result of ingesting drinking water contaminated with Defendants' fluorochemical products.

10.     As a result of Plaintiff's exposure to Defendants' fluorochemical products, Plaintiff was diagnosed with thyroid cancer, which has caused Plaintiff to suffer severe personal injuries, pain, and emotional distress.

11.     The injuries, pain, suffering, and emotional distress were directly and proximately caused by Defendants' fluorochemical products.

**DEFENDANTS**

12.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

13.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

14.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of defendants, and did so while acting within the scope of their duties, employment or agency.

15.     At all times relevant to this litigation, upon information and belief, each of the Defendants designed, developed, manufactured, marketed and/or sold the AFFF and/or fluorochemical products containing PFOA or PFOS to be used throughout the country, including in the vicinity of Plaintiff.

16.     Each of the Defendants designed, developed, manufactured, marketed and/or sold the AFFF or fluorochemical products containing PFOA or PFOS to which Plaintiff was exposed and directly and proximately caused Plaintiff to develop substantial physical injuries, and to suffer severe personal injuries, pain, suffering, and emotional distress.

17.     3M Company (f/k/a/ Minnesota Mining and Manufacturing Company) ("3M") is a Delaware Corporation and conducts business throughout the United States, with its principal place of business located at 3M Center, St. Paul Minnesota 55144.

18.     For a substantial period of time, 3M designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

19.     Amerex Corporation ("Amerex") is an Alabama corporation and does Business throughout the United States, with its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173.

20.     For a substantial period of time, Amerex designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

21.     Buckeye Fire Equipment Company ("Buckeye") is a corporation organized and existing under the laws of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

22.     For a substantial period of time, Buckeye designed, manufactured, marketed, distributed, and/or sold AFFF products throughout the United States. Buckeye was a founding member of the Fire Fighting Foam Coalition and, through its active participation in this coalition, Buckeye marketed and sold its AFFF products throughout the United States.

23.     Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of Texas, with its principal place of business at one Stanton Street, Marinette, Wisconsin 54143.

24.     For a substantial period of time, Chemguard designed, manufactured, marketed, distributed, and/or sold AFFF products throughout the United States. On information and belief, Chemguard acquired Ciba Specialty Chemical Corporation's fluorosurfactants business. Chemguard was a founding member of the Fire Fighting Foam Coalition.

25.     Upon information and belief, Chemguard is a subsidiary of Johnson Controls International PLC. Chemguard is also a subsidiary of Johnson Controls, Inc.

26.     Tyco Fire Products L.P. ("Tyco") is a limited partnership organized under the laws of Delaware, with its principal place of business at 5757 North Green Bay Ave., Milwaukee, WI 53209.

27.     Tyco is a subsidiary of Johnson Controls International PLC. Tyco is also a subsidiary of Johnson Controls, Inc.

28.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

29.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFOA and PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFOA and PFOS.

30.     Upon information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard AFFF products through its Chemguard Specialty Chemicals division.

31.     For a substantial period of time, Tyco designed, manufactured, marketed, distributed, and/or sold AFFF products throughout the United States. Tyco was a founding member of the Fire Fighting Foam Coalition.

32.     National Foam, Inc. ("National Foam") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501 and at 350 East Union Street, West Chester, Pennsylvania 19382. Upon information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd., a United Kingdom private limited company.

33.     For a substantial period of time, National Foam designed, manufactured, marketed, distributed, and/or sold AFFF products throughout the United States. National Foam was a member of the Fire Fighting Foam Coalition.

34.     E. I. DuPont de Nemours & Company ("DuPont") is a corporation organized and existing under the laws of Delaware, having a principal place of business is 974 Centre Road Wilmington, Delaware 19805. DuPont engaged in a multi-year scheme to insulate its assets and defraud its creditors.

35.     DuPont is a successor in interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

36.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

37.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003, and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

38.     The letter, which was redacted and sent to the United States Environmental Protection Agency ("EPA") under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.

39.     The Chemours Company ("Chemours") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19889.

40.     In 2015, DuPont spun off its "performance chemicals" business to Chemours along with certain environmental liabilities with the intent to hinder, delay, or defraud creditors and/or individuals that held claims related to environmental and human health damages from DuPont's

fluorochemical products. Upon information and belief, at the time of the transfer of its performance chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorochemicals and the products that contain fluorochemicals.

41.     During the Chemours spin-off, Chemours assumed $4 billion of debt and significant liabilities under the separation agreement, while simultaneously transferring valuable assets to DuPont, including the $3.9 billion dividend. Through the transfer of assets and liabilities as part of the Chemours spin-off, DuPont limited the availability of assets to cover its PFAS liabilities. The exchange of assets and liabilities in the Chemours spin-off was made to benefit, or for the benefit of, DuPont.

42.     The DuPont and Chemours spin-off concealed the liabilities actually assumed by Chemours. DuPont and Chemours acted to conceal information about the spin-off, including withholding information from Chemours management designees, withholding the schedules to the Chemours separation agreement from the public, and requiring confidential mediation of all disputes related to the transaction, under terms that favored DuPont.

43.     The Chemours Company FC LLC ("Chemours FC"), a successor in interest to DuPont Chemical, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street Wilmington, Delaware 19899.

44.     Chemicals, Inc. ("Chemicals") is a Texas corporation and does business throughout the United States. Chemicals has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

45.    For a substantial period of time, Chemicals designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

46.    Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805. Corteva is the successor-in-interest to Dupont Chemical Solution

47.    For a substantial period of time, Corteva designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

48.    Daikin America, Inc. ("Daikin") is a foreign corporation organized under the laws of Delaware that conducts business throughout the United States. Its principal of business is 1209 Orange Street, Wilmington, Delaware 19801.

49.    For a substantial period of time, Daikin designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

50.    Fire Service Plus, Inc. ("Fire Service") is a corporation organized under the laws of the state of Georgia that conducts business throughout the United States. Its principle place of business is 473 Dividend Drive, Peachtree, Georgia 30269.

51.    For a substantial period of time, Fire Service designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

52.    Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware and does business throughout the United States. Kidde-Fenwal has its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

53.    Kidde-Fenwal is a successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, (Kidde/Kidde Fire")

54. For a substantial period of time, Kidde-Fenwal designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

55. Kidde P.L.C., Inc. ("Kidde P.L.C.") is a foreign corporation organized and existing under the laws of the State of Delaware and does business throughout the United States. Kidde P.L.C. had its principle place of business at One Carrier Place, Farmington, Connecticut 06034. Upon information and belief, Kidde P.L.C. was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

56. For a substantial period of time, Kidde P.L.C. designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

57. Perimeter Solutions LP ("Perimeter") is a Missouri Limited Partnership and does business throughout the United States. Perimeter has its principal place of business at 120 South Central Avenue, Clayton, Missouri 63105.

58. For a substantial period of time, Perimeter designed, manufactured, marketed, distributed, and/or sold fluorochemical products and AFFF products throughout the United States.

59. Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

60. On June 1, 2019, DowDuPont, Inc. separated its business through a spin-off with Corteva. Prior to the separation, DowDuPont owned Corteva as a wholly-owned subsidiary formed in February 2018.

61. On June 1, 2019, DowDuPont distributed a pro rata dividend of both issued and outstanding shares of Corteva common stock to DowDuPont shareholders.

62.     Through the spin-off, DowDuPont transferred valuable assets and business lines to Corteva. Corteva now holds certain DowDuPont assets and liabilities.

63.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva.

64.     Defendants E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

65.     Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

66.     Arkema develops specialty chemicals and fluoropolymers.

67.     Arkema is a successor in interest to Elf Atochem North America and Atofina Chemicals Inc., which manufactured fluorosurfactants containing PFOA that was used in AFFF.

68.     AGC Chemicals Americas Inc. ("AGC Americas") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201 Exton, PA 19341 United States.

69.     AGC Americas operates throughout the United States, manufacturing glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates, including those used in AFFF products.

70.     Dynax Corporation ("Dynax") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge,

New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544.

71.     On information and belief, Dynax entered the AFFF business in 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

72.     Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business at 196122 E County Road 40, Woodward, Oklahoma 73801. On information and belief, Deepwater has designed, manufactured, marketed, distributed, and/or sold AFFF products and/or fluorochemicals throughout the United States.

73.     Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ.  Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including, but not limited to, Chubb Fire & Security, Ltd., Chubb Security PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

74.     Chubb conducts business throughout the United States, including those states and locations where Plaintiff was exposed. At all times relevant, Chubb designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise handled and/or used PFAS-containing AFFF products that are used in firefighting training and response activities which are the subject of this Complaint. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and by members of the military.

75.     Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205. On information and belief, Clariant was formerly known as Sandoz Chemical Corporation. The Sandoz Chemical Corporation spun off its specialty chemicals business to form Clariant. For a substantial period of time, Clariant manufactured fluorointermediates used in AFFF products.

76.     Archroma U.S., Inc. is a Delaware corporation with its principal place of business at 5435 77 Center Drive, Suite 10, Charlotte, North Carolina 28217. Archroma U.S. Inc. is a subsidiary of Archroma Management, LLC, a foreign limited liability company registered in Switzerland. Archroma was formed when the Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners. On information and belief, Archroma U.S., Inc. and Clariant designed, manufactured, marketed, distributed, and/or sold fluorochemicals for use in manufacturing AFFF products throughout the United States.

77.     BASF Corporation, ("BASF"), is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

78.     On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

79.     On information and belief, BASF Corporation is the successor in interest to CibaGeigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., a Swiss specialty chemicals company, that manufactured fluorosurfactants containing PFOA used in AFFF.

80.     United Technologies Corporation ("United Technologies") is a foreign corporation organized and existing under the laws of the State of Delaware and conducts business throughout

the United States, including those states and locations where Plaintiff was exposed.  United Technologies has its principal place of business at 8 Farm Springs Road, Farmington, CT 06032.

81.     UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Texas 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC does and/or has done business throughout the United States and manufactured and sold AFFF.

82.     Upon information and belief, UTC was created when United Technologies acquired Kidde PLC, Inc. and combined it with Chubb Fire, Ltd., a United Kingdom private limited company.

83.     Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier. Upon information and belief, UTC completed a spin-off of one of its reportable segments into Carrier, a separate, publicly traded company.

84.     For a substantial period of time, Carrier manufactured, marketed, distributed, and/or sold AFFF products. Upon information and belief, Carrier does and/or has done business throughout the United States.

85.     ChemDesign Products, Inc. is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143, that manufactured fluorosurfactants containing PFOA used in AFFF products.

86.     Nation Ford Chemical Company ("Nation Ford") is a South Carolina Corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.  Upon

information and belief, Nation Ford manufactured fluorochemicals for use in PFAS-containing AFFF products.  Nation Ford conducts business throughout the United States, including those states and locations where Plaintiff was exposed.

87.     Allstar Fire Equipment is a California corporation ("Allstar") and does business throughout the United States. Allstar has its principal place of business at 12328 Lower Azusa Road, Arcadia, California 91006. Allstar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

88.     Fire-Dex, LLC ("Fire-Dex") is a Delaware corporation and does business throughout the United States. Fire-Dex has its principal place of business at 780 South Progress Drive, Medina, Ohio 44256. Fire-Dex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

89.     Globe Manufacturing Company LLC ("Globe") is a New Hampshire corporation and does business throughout the United States. Globe has its principal place of business at 37 Loudon Road, Pittsfield, New Hampshire 03263. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

90.     Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation and does business throughout the United States. Honeywell has its principal place of business at 300 South Tryon Street Suite 500, Charlotte, North Carolina 28202. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

91.     Lion Group, Inc. ("Lion") is an Ohio corporation and does business throughout the United States. Lion has its principal place of business at 7200 Poe Avenue, Suite 400 Dayton, Ohio, 45414. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

92.     Mallory Safety and Supply LLC ("Mallory") is a Washington corporation and does business throughout the United States. Mallory has its principal place of business at 1040 Industrial Way, Longview, Washington, 98632. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

93.     Mine Safety Appliances Co., Inc. ("MSA") is a Pennsylvania corporation and does business throughout the United States. MSA has its principal place of business at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania, 16066. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

94.     Municipal Emergency Services, Inc. ("MES") is a Nevada corporation and does business throughout the United States. MES has its principal place of business at 12 Turnberry Lane, Sandy Hook, Connecticut 06482. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

95.     PBI Performance Products, Inc. ("PBI") is a Delaware corporation and does business throughout the United States. PBI has its principal place of business at 9800-D Southern Pine Boulevard, Charlotte, North Carolina 28273. PBI developed, manufactured, marketed,

distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

96.    Southern Mills, Inc. ("Southern Mills") is a Georgia corporation and does business throughout the United States. Southern Mills has its principal place of business at 6501 Mall Boulevard, Union City, Georgia 30291. Southern Mills developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

97.    Stedfast USA, Inc. ("Stedfast") is a Delaware corporation and does business throughout the United States. Stadfast has its principal place of business at 800 Mountain View Drive, Piney Flats, Tennessee 37686. Stedfast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

98.    W.L. Gore & Associates Inc. ("Gore") is a Delaware corporation and does business throughout the United States. Gore has its principal place of business at 1901 Barksdale Road, Newark, Delaware 19711. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

## FACTUAL ALLEGATIONS

### THE FLUOROCHEMICALS: PFOA AND PFOS

99.    Fluorochemical products are man-made chemicals composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical

bonds that occur in nature, which is a reason why these molecules are so persistent. Fluorochemical products that contain eight carbon-fluorine bonds are sometimes referred to as "C8."

100.     Fluorochemical products are highly water soluble, which facilitates the ease at which they spread throughout the environment, contaminating soil, groundwater, and surface water. This mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.

101.     Fluorochemical products are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.

102.     Fluorochemical products are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.

103.     Since they were first produced, information has emerged showing negative health effects caused by exposure to fluorochemical products.

104.     According to the EPA, studies indicate that exposure to fluorochemical products over certain levels may result in developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes).

105.     The EPA has also warned that there is suggestive evidence of carcinogenic potential for fluorochemical products.

106.     The EPA has noted that drinking water can be an additional source of PFC's in the small percentage of communities where these chemicals have contaminated water supplies. "In

communities with contaminated water supplies, such contamination is typically localized and associated with a specific facility, for example…an airfield at which fluorochemical products were used for firefighting."

107.    The EPA has issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

108.    TOG is personal protective equipment designed for heat and moisture resistance in order to protect firefighters in hazardous situations. Most turnout gear is made up of a thermal liner, moisture barrier, and an outer layer. The inner layers contain PFAS, and the outer layer is often treated with additional PFAS.

109.    Plaintiff regularly used, and was thereby directly exposed to, AFFF and TOG during Plaintiff's career as a firefighter when extinguishing fires and in training and drilling to extinguish fires.

110.    During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include individual components such as a helmet, hood, jacket, pants and suspenders, boots, and gloves. Each component of the jacket and pants are made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

111.    PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.

112.    A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA, Globe, Lion and Honeywell and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including Plaintiff.

113.    When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' personal vehicles and homes.

114.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

115.    As alleged herein, Plaintiff wears and/or wore turnouts in the ordinary course of performing Plaintiff's firefighting training and drilling duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed Plaintiff to significant levels of PFAS.

116.    Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that the turnouts Plaintiff wore or used in the course of performing Plaintiff's duties

contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that Plaintiff routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts Plaintiff wore or used in performing Plaintiff's duties. The turnout gear worn or used by Plaintiff did not and does not contain labeling information saying that the gear contains PFAS, and similarly did not and does not warn Plaintiff of the health risks associated with exposure to PFAS.

## AQUEOUS FILM-FORMING FOAM

117.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

118.    The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

119.    The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained fluorochemical products.

120.    PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

121.    All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

122.    AFFF can be made without PFOA, PFOS, or their precursor chemicals, that do not release PFOA, PFOS, and/or their precursor chemicals into the environment or in humans.

123.    When used as Defendants intended and directed, Defendants' AFFF released PFOA, PFOS, and/or their precursor chemicals into the environment, including water sources.

124.    Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. Because of their persistence, they are widely distributed throughout soil, air, and groundwater.

125.    Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Plaintiff.

## DEFENDANTS' KNOWLEDGE

126.    On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can only be removed from drinking water supplies at substantial expense.

127.    Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens which cause genetic damage and cancer.

128.    In 1980, 3M published data in peer-reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.

129.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

130.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.

131.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

132.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

133.     From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold fluorochemical products, including Teflon nonstick cookware, and more recently, PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

134.     Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold fluorochemical products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products.

135.     DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew it was contaminating the drinking water drawn from the Ohio River, and did not disclose to the public or to government regulators what DuPont knew about the substance's potential effects on humans, animals, and the environment.

136.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."

137.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from its Washington Works plant reviewed the available scientific evidence and concluded that a "probable link" exists between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia. By October 2012, the C8 Science Panel concluded that a probable link also exists between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

138.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

139.    In 2001, DuPont, Dynax, and other Defendants founded the Fire Fighting Foam Coalition ("FFFC"), a coalition formed to advocate for AFFF's continued viability despite increasing concern around the health and environmental risks of Defendants' fluorochemical products.

140.    The FFFC presented to the US EPA, various branches of DOD, and other AFFF users discussing the importance of AFFF and asserting that the product was safe for human health and the environment.

141.    In part, through its involvement in the FFFC, DuPont, National Foam, and other FFFC members actively marketed, sold, distributed, and lobbied for the continued use of AFFF and fluorochemical products used in AFFF.

142.    In the early 2000s, manufacturing companies began developing fluorine-free firefighting foams as environmentally friendly alternatives to AFFF. Despite the tested potential, the FFFC publicly opposed the development of fluorine-free foams insisting that no other product could suppress fires the way AFFF can.

143.    After the phase out of PFOA and PFOS, the FFFC continued to emphasize the safety of the fluorosurfactants used in Modern AFFF. In a 2007 newsletter endorsed by Defendants DuPont and Dynax, the FFFC stated Modern AFFF "do not contain or break down into [PFOS or PFOA]" but instead contain "fluorosurfactants that are persistent (which is a characteristic of fluorinecontaining materials) but are not generally considered to be significant environmental toxins."

144.    Despite discovering additional information regarding the persistent, toxic, and bioaccumulative nature of fluorosurfactants used in Modern AFFF since 2003, neither the FFFC, nor any of its members, approached the EPA to revisit its decision to exclude Modern AFFF from the PFOA Emerging Contaminant Assessment.

145.    At the time of filing this Complaint, the FFFC asserts through its website and many publications that AFFF is safe and essential to fire suppression.

146.    As of at least the year 2020, the FFFC continues to assert that AFFF and its breakdown products do not pose a human health or environmental impact.

147.    At the time of filing this Complaint, the FFFC continues to oppose the use of nonfluorosurfactant firefighting foams.

148.    Defendants Chemours and Clariant Corporation were members of the FluoroCouncil, a group formed to represent the interests of the world's leading manufacturers of fluorotechnology products. In 2018, the FluoroCouncil announced a new website "that showcases information on the benefits and safety of fluorinated chemistries," despite the industry's knowledge of the toxicity of PFAS. A blog post touting the new website noted that "Fluorinated chemistries, or per- and polyfluoroalkyl substances (PFAS), are a diverse group of chemistries characterized by the strong bond between fluorine and carbon. Fluorinated chemistries provide products with the resilience and durability they require, and such products can be used safely."

149.    In 2019, the FluoroCouncil informed the EPA that short-chained PFAS, are "widely understood not to present toxicity concerns" and that "studies show short-chain fluorotelomer-based products do not present significant adverse impacts."

150.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold AFFF products containing fluorochemicals, and/or fluorochemical products for use in AFFF; (2) failed to issue instructions on how AFFF containing fluorochemical products should be used and disposed of; (3) failed to recall and/or warn the users of fluorochemical products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of fluorochemical products, notwithstanding the fact that Defendants knew foreseeable the identities of the purchasers and end-users of the fluorochemical products, as well as the final fate of fluorochemical products in water and biota, including in humans such as Plaintiff.

## **PLAINTIFF'S EXPOSURE TO DEFENDANTS'**

## **AFFF AND FLUOROCHEMICAL PRODUCTS**

151.    Upon information and belief, the entities that employed Plaintiff or utilized Plaintiff's services stored and used Defendants' AFFF and/or fluorochemical products which contained PFOA and/or PFOS chemicals and/or their precursor chemicals in military and/or firefighter training and response exercises during Plaintiff's employment and/or military service.

152.    Defendants designed, manufactured, marketed, distributed, and/or sold AFFF and/or fluorochemical products to the U.S. Military and fire departments across the United States.

153.    The descriptive labels and material safety data sheets for Defendants' AFFF products and fluorochemical products containing PFOA or PFOS and/or their precursor chemicals utilized by firefighters and military personnel within those states and locations where Plaintiff was exposed did not reasonably or adequately describe AFFF's risks to human health.

154.    Throughout Plaintiff's career as a firefighter, Plaintiff was exposed to Defendants' AFFF, TOG, and/or fluorochemical products.

155.    During Plaintiff's exposure to Defendants' AFFF, TOG, and/or fluorochemical products which contained PFOA and/or PFOS and/or their precursor chemicals, the PFOA and/or PFOS and/or their precursor chemicals entered Plaintiff's body.

156.    At no point during Plaintiff's training or career did Plaintiff receive any warning that Defendants' AFFF products containing PFOA and/or PFOS and/or their precursor chemicals were toxic or carcinogenic.

157.    During Plaintiff's exposure to Defendants' AFFF products, Plaintiff was dermally exposed to Defendants' AFFF products containing PFOA and/or PFOS and/or their precursor chemicals, causing PFOA and/or PFOS and/or their precursor chemicals to enter Plaintiff's body.

Plaintiff also was exposed to Defendants' AFFF and fluorochemical products by unknowingly ingesting drinking water contaminated with Defendants' AFFF and fluorochemical products.

158.    During his career as a firefighter, Plaintiff was directly exposed to AFFF, TOG, and fluorochemical products when extinguishing fires and when training and drilling to extinguish fires.

159.    Plaintiff also was exposed to Defendants' AFFF and fluorochemical products during his military career by unknowingly ingesting drinking water contaminated with Defendants' AFFF and fluorochemical products.

160.    The Defendants knew or should have known of the hazards of AFFF and/or TOG containing PFOA or PFOS and/or their precursor chemicals when the products were manufactured and then subsequently used and ingested by Plaintiff.

161.    As a result of Plaintiff's exposure to Defendants' AFFF, TOG, and fluorochemical products containing PFOA and/or PFOS and/or their precursor chemicals, Plaintiff was diagnosed with thyroid cancer.

162.    Plaintiff suffered, and continues to suffer, the effects of Plaintiff's injuries proximately caused by exposure to Defendants' AFFF, TOG, and/or fluorochemical products.

## FIRST CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

163.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

164.    At all times relevant to this Complaint, Defendants were regularly engaged in the business of testing, developing, designing, researching, formulating, manufacturing, distributing, promoting, marketing, labeling, and/or selling of AFFF, TOG, and fluorochemical products.

165.    At all times pertinent to this Complaint, Defendants regularly participated in placing AFFF and fluorochemical products into the stream of commerce throughout the United States, including within those locations where Plaintiff was exposed.

166.    Defendants knew or should have known: exposure to AFFF, TOG, or fluorochemical products are hazardous to human health.

167.    Defendants knew or should have known: the manner in which AFFF, TOG, or fluorochemical products were designed, manufactured, marketed, distributed, and sold was hazardous to human health.

168.    Defendants knew or should have known: the manner in which AFFF, TOG, or fluorochemical products was designed, manufactured, marketed, distributed, could and would release PFAS or PFOS into Plaintiff and cause the exposure and bioaccumulation of these toxic and poisonous chemicals in the blood and/or body of Plaintiff.

169.    Knowing of the dangerous and hazardous properties of the AFFF, TOG, or fluorochemical products, Defendants could have designed, manufactured, marketed, distributed, and sold alternative designs or formulations of AFFF, TOG, or fluorochemical products that did not contain hazardous and toxic PFAS or PFOS. These alternative designs and formulations were already available, practical, and technologically feasible. The use of these alternative designs would have reduced or prevented reasonably foreseeable harm to Plaintiff caused by the Defendants' design, manufacture, marketing, distribution, and sale of AFFF, TOG, or fluorochemical products containing hazardous and toxic PFAS or PFOS.

170.    The AFFF, TOG, or fluorochemical products that were designed, manufactured, marketed, distributed, and sold by the Defendants were so hazardous, toxic, and dangerous to human health that the act of designing, formulating, manufacturing, marketing, distributing, and

31

selling this AFFF, TOG, or fluorochemical products was unreasonably dangerous under the circumstances.

171.    The AFFF, TOG, or fluorochemical products designed, formulated, manufactured, marketed, distributed, and sold by Defendants was defectively designed and the foreseeable risk of harm could and would have been reduced or eliminated by the adoption of a reasonable alternative design that was not unreasonably dangerous. Defendants' defective design and formulation of AFFF, TOG, or fluorochemical products was a direct and proximate cause of the contamination of the blood and/or body of Plaintiff and the persistence and accumulation of PFAS or PFOS in Plaintiff's blood and/or body.

172.    Defendants' defective design and formulation of AFFF, TOG, or fluorochemical products caused the contamination described herein resulting in personal injury to Plaintiff. As a direct result of the harm and injury caused by Defendants' defective design and the contamination described herein, Plaintiff has been exposed to AFFF, TOG, or fluorochemical products containing PFAS or PFOS and other toxic substances.

173.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of AFFF, TOG, and/or fluorochemical products, Defendants owed a duty to use reasonable care to all persons whom Defendants' products might foreseeably cause harm, including Plaintiff, not to manufacture, sell, and/or market any product which is unreasonably dangerous for its intended and foreseeable uses.

174.    All Defendants exercised substantial control over the design, testing, manufacture, packaging, and/or labeling of their AFFF, TOG, and/or fluorochemical products that proximately and directly caused Plaintiff's injuries.

175.    Users of Defendants' AFFF, TOG, and fluorochemical products, such as Plaintiff, used such fluorochemical products in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

176.    Defendants' fluorochemical products used by Plaintiff did not perform as safely as an ordinary consumer would have expected the products to perform when used in an intended or reasonably foreseeable manner because PFOA and PFOS are carcinogens and otherwise harmful to human health.

177.    Defendants represented, asserted, claimed, and warranted that their AFFF, TOG, and fluorochemical products were safe for their intended and foreseeable uses.

178.    At all times relevant to this action, Defendants' AFFF, TOG, and fluorochemical products were used and disposed of in a manner in which they were reasonably foreseeably intended to be used.

179.    Defendants' AFFF, TOG, and fluorochemical products were distributed and sold as intended or in a manner that was reasonably foreseeable by the Defendants or should have been reasonably foreseeable by Defendants.

180.    Defendants' AFFF, TOG, and fluorochemical products were not reasonably safe as designed at the time they left Defendants' control.

181.    Defendants' AFFF, TOG, and fluorochemical products reached consumers and users, such as Plaintiff, in a condition substantially unchanged from that in which they left the Defendants' control.

182.    Defendants failed to inform users, such as Plaintiff, and any party that could have effectively reduced the risk of harm related to using AFFF and fluorochemical products, and the care required to use and dispose of the product safely.

183.    The risks of AFFF and fluorochemical products were not obvious to users of such products, including Plaintiff, nor were they obvious to users in the vicinity of the AFFF use, including Plaintiff, who were unwittingly exposed to Defendants' toxic and carcinogenic chemicals.

184.    Plaintiff, as an ordinary user, could not have reasonably discovered the defects, risks, and dangers associated with the use of AFFF and fluorochemical products, and could not protect against the exposure to Defendants' AFFF and fluorochemical products.

185.    Plaintiff, as an ordinary user of Defendants' AFFF and fluorochemical products, was unaware that using Defendants' AFFF and fluorochemical products created an unreasonable risk of personal injury to Plaintiff.

186.    The harm caused by Defendants' AFFF and fluorochemical products far outweighed its benefits, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate, including Plaintiff.

187.    The seriousness of the human health risk posed by Defendants' AFFF and fluorochemical products far outweighs any purported social utility of Defendants' conduct in manufacturing, selling, distributing, and marketing their AFFF and concealing the dangers posed to human health and the environment.

188.    Plaintiff could not have reasonably discovered the defects and risks associated with Defendants' AFFF and fluorochemical products intended to manufacture AFFF before or at the time of Plaintiff's exposure to Defendants' fluorochemical products and AFFF. In fact, Defendants intentionally hid this critical information from the public, including Plaintiff.

189.    At all relevant times, Defendants knew or should have known about the availability and/or possibility that there were reasonably safer and feasible alternatives to using their AFFF and/or TOG products.

190.    Notwithstanding, Defendants continued to manufacture, market, distribute, promote, and sell AFFF, fluorochemical products, and/or TOG despite such knowledge and despite the foreseeable and known harms to maximize their profits.

191.    Defendants' fluorochemical products failure to perform safely was a substantial factor in causing Plaintiff's harm.

192.    As a result of the unreasonably dangerous conditions of Defendants' AFFF, fluorosurfactants and/or TOG, Defendants are strictly liable to Plaintiff.

193.    As a direct and proximate result, Plaintiff has incurred and will continue to incur costs and damages related to exposure to Defendants' AFFF, fluorochemical products, and/or TOG.

194.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has suffered monetary losses and damages in amounts to be proven at trial.

195.    As a result of Defendants' design and formulation of a defective product – AFFF, fluorochemical products and/or TOG – Defendants are strictly liable in damages to Plaintiff.

196.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

197.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

198.    Defendants were engaged in the business of testing, developing, designing, researching, formulating, manufacturing, distributing, promoting, marketing, and selling AFFF, TOG, and/or fluorochemical products.

199.    Defendants knew or should have known that exposure to AFFF, TOG, and/or fluorochemical products presented a substantial danger when used because it is hazardous to human health and the environment.

200.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, TOG, and/or fluorochemical products would result in physical harm to Plaintiff.

201.    As formulators, manufacturers, distributors, marketers, promoters, and/or sellers of AFFF, TOG, and/or fluorochemical products, as defined herein, Defendants had a duty to warn Plaintiff of the health risks posed by exposure to Defendants' AFFF, TOG, and/or fluorochemical products.

202.    The AFFF, TOG, and/or fluorochemical products that Defendants manufactured, marketed, sold, distributed, and supplied are defective and unreasonably dangerous products and pose significant risks to human health, including Plaintiff.

203.    At all times relevant to this action, Defendants' AFFF, TOG, and fluorochemical products were distributed, used, and disposed of as intended or in a manner that was reasonably foreseeable by the Defendants or should have been reasonably foreseeable by Defendants.

204.    Defendants' AFFF, TOG, and fluorochemical products reached consumers, Plaintiff, and the environment in a condition substantially unchanged from that in which it left the Defendants' control.

205.    Defendants' AFFF, TOG, and fluorochemical products were not reasonably safe at the time it left Defendants' control because it lacked adequate warnings and instructions.

206.    Without adequate warnings or instructions, Defendants' AFFF, TOG, and fluorochemical products were unsafe to an extent beyond that which would be contemplated by an ordinary person, including Plaintiff.

207.    Defendants knew that by failing to warn Plaintiff, the public, public officials, consumers, and other users of AFFF, TOG, and fluorochemical products of the risks posed by AFFF, TOG, and fluorochemical products, their fluorochemical products intended to be used in AFFF or TOG would be purchased, transported, stored, handled, used, and disposed of without users and consumers being aware of the hazards that exposure to fluorochemical products poses to human health.

208.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of their AFFF, TOG, and/or fluorochemical products because they knew, and should have known, of the unreasonable risks of harm associated with the use, exposure to, and/or disposal of AFFF, TOG, and/or fluorochemical products.

209.    Despite this knowledge, Defendants represented, asserted, claimed, and warranted that their AFFF, TOG, and/or fluorochemical products were safe for their intended and foreseeable uses and disposal, and did not require any special handling or precautions.

210.    Defendants could have warned the public, including Plaintiff, about the risks of their AFFF, TOG, and fluorochemical products but failed to do so and intentionally concealed information to maximize their profits.

211.    Defendants knew, or should have known, that use of their AFFF, TOG, and fluorochemical products would result in Plaintiff's exposure to such AFFF and fluorochemical products.

212.    Defendants knew, or should have known, that use of their AFFF, TOG, and fluorochemical products would result in the discharge, disposal, emission, release, or spillage of AFFF and fluorochemical products, as defined herein, into the surface water, wetlands, groundwater, soil, and sediments near Plaintiff.

213.    Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, the public, public officials, consumers, and other users of AFFF, TOG, and fluorochemical products with warnings regarding the potential and/or actual threat to human health caused by AFFF exposure and contamination, despite Defendants' vast amount of knowledge and research demonstrating that AFFF exposure and contamination presented threats to human health.

214.    Defendants knew or should have known: exposure to AFFF, TOG, or fluorochemical products containing PFAS or PFOS was hazardous to human health, including Plaintiff's health.

215.    Defendants knew or should have known: the manner in which they were designing, marketing, developing, manufacturing, distributing, releasing, training, instructing, promoting, and selling AFFF, TOG, and fluorochemical products containing PFAS or PFOS was hazardous to human health, including Plaintiff's health.

216.    Defendants knew or should have known: the manner in which they were designing, marketing, developing, manufacturing, marketing, distributing, releasing, training, instructing, promoting and selling AFFF, TOG, or fluorochemical products containing PFAS or PFOS would result in the contamination of Plaintiff's blood and/or body as a result of Plaintiff's exposure.

217. Defendants had a duty to warn of the hazards associated with AFFF, TOG, or fluorochemical products containing PFAS or PFOS entering the blood and/or body of Plaintiff because they knew of the dangerous, hazardous, and toxic properties of AFFF, TOG, or fluorochemical products containing PFAS or PFOS. Defendants failed to provide sufficient warning to purchasers that the use of their AFFF, TOG, or fluorochemical products would cause PFAS or PFOS to be released and cause the exposure and bioaccumulation of these toxic chemicals in the blood and/or body of Plaintiff.

218. Adequate instructions and warnings on the AFFF, TOG, or fluorochemical products containing PFAS or PFOS could have reduced or avoided these foreseeable risks of harm and injury to Plaintiffs.

219. If Defendants provided adequate warnings: Plaintiff could have and would have taken measures to avoid or lessen exposure.

220. If Defendants provided adequate warnings: end users and governments could have taken steps to reduce or prevent the release of PFASs into the blood and/or body of Plaintiff. Defendants' failure to warn was a direct and proximate cause of Plaintiff's injuries from PFAS that came from the use, storage, and disposal of AFFF or TOG containing PFAS. Crucially, Defendants' failure to provide adequate and sufficient warnings for the AFFF or TOG containing PFAS they designed, marketed, manufactured, distributed, released, promoted, and sold renders the AFFF or TOG a defective product.

221. Defendants were negligent in their failure to provide Plaintiff with adequate warnings or instruction that the use of their AFFF or TOG products would cause PFAS to be released into the blood and/or body of Plaintiff. As a result of Defendants' conduct and the

resulting contamination, Plaintiff suffered severe personal injuries by exposure to AFFF or TOG containing PFAS.

222.   At all times relevant to this litigation, Defendants had either actual or constructive knowledge that their AFFF, TOG, and/or fluorosurfactants were hazardous to Plaintiff, including knowledge that: (i) AFFF contamination is released into the environment through the normal and foreseeable use of AFFF products, use of fluorosurfactants in AFFF manufacturing processes, and disposal of AFFF contaminated waste; (ii) when released into the environment, AFFF contamination persists over long periods of time and is resistant to biodegradation and bioremediation; (iii) AFFF contamination bioaccumulates in humans and wildlife; (iv) AFFF contamination can move and migrate great distances in both surface water and groundwater; and (v) AFFF contamination poses significant risks to human health and the environment, even at very low levels.

223.   Adequate instructions and warnings on the AFFF, TOG, and/or fluorochemical products could have reduced or avoided these foreseeable risks of harm to Plaintiff's health.

224.   Had Defendants provided adequate warnings and instructions, Plaintiff could have taken measures to avoid or lessen the exposure.

225.   The lack of sufficient warnings and instructions was a substantial factor in causing Plaintiff's injuries.

226.   Defendants' failure to warn was a direct and proximate cause of Plaintiff's illnesses alleged above.

227.   Plaintiff used Defendants' AFFF and fluorochemical products in the manner and for the purposes for which they were intended.

228.    Defendants failed to adequately warn and instruct Plaintiff of the potential risks of AFFF and fluorochemical products, despite having superior knowledge of their AFFF and fluorochemical products' defective and dangerous condition.

229.    Adequate instructions and warnings on the AFFF and fluorochemical products could have reduced or avoided these foreseeable risks of harm to Plaintiff's health.

230.    Plaintiff could not have reasonably discovered the defects and risks associated with Defendants' AFFF and fluorochemical products before or at the time of Plaintiff's exposure, absent sufficient warnings.

231.    As a result of the Defendants failure to warn about the unreasonably dangerous conditions of their AFFF, TOG, and/or fluorochemical products, Defendants are strictly liable to Plaintiff.

232.    As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

233.    Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of Plaintiff.

234.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has suffered monetary losses and damages in amounts to be proven at trial.

## THIRD CAUSE OF ACTION

### NEGLIGENCE

235.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

236.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of fluorochemical products, Defendants owed a duty to Plaintiff to exercise

reasonable care in the manufacturing, design, testing, selling, distribution, instructing, labeling, and warning of the handling, control, use and disposal of Defendants' fluorochemical products.

237.    Defendants had a duty to individuals, including Plaintiff, to exercise reasonable ordinary, and appropriate care in the manufacturing, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training related to the AFFF, TOG and fluorochemical products.

238.    Defendants breached their duty of care and were negligent, grossly negligent, reckless and willful as described herein in the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of the AFFF, TOG and fluorochemical products in one or more of the following respects: (1) failing to design the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff; (2) failing to use reasonable care in the testing of the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff; (3) failing to use appropriate care in inspecting the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff; (4) failing to use appropriate care in instructing and/or warning the public as set forth herein of risks associated with the products, so as to avoid unreasonable risk of harm to individuals, including Plaintiff; (5) failing to use reasonable care in marketing, promoting, and advertising the products so as to avoid unreasonable risk of harm to individuals, including Plaintiff; (6) otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning; and; (7) in selling and or distributing a product which was inherently dangerous to the public.

239.    Defendants also voluntarily assumed a duty towards Plaintiff by affirmatively representing to Plaintiff and/or users of Defendants' AFFF, TOG and fluorochemical products that Defendants' previously detailed acts and/or omissions were not causing any physical harm or other

damage to Plaintiff, and that Defendants' fluorochemical products were safe to use or be exposed to.

240.     Defendants' fluorochemical products are inherently dangerous substances and Defendants owed a duty of care towards the Plaintiff that was commensurate with the harmful nature of the fluorochemical products and the dangers involved with exposure to fluorochemical products.

241.     Defendants failed to correct, clarify, rescind, and/or qualify its representations to Plaintiff and/or users of Defendants' AFFF, TOG and fluorochemical products that Defendants' acts and/or omissions were not causing any physical harm and/or damage to Plaintiff, or that the fluorochemical products were safe to use or be exposed to.

242.     Despite knowing that their fluorochemical products are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants failed to use reasonable care when they: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold fluorochemical products; (b) issued instructions on how fluorochemical products should be used and disposed of; (c) failed to recall and/or warn the users of fluorochemical products of the dangers to human health and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of fluorochemical products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers and users of their fluorochemical products.

243.     Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly acted or failed to act in designing, manufacturing, marketing, distributing, promoting,

selling, testing, labeling, warning, and instructing on the use and disposal of AFFF, TOG and fluorochemical products that have been used and/or disposed of by Plaintiff in such a manner as to directly and proximately cause exposure to Plaintiff, thereby causing harm to Plaintiff, despite their years-long knowledge that exposure to such chemicals are harmful to human health.

244.    But for Defendants' negligent acts and/or omissions, Plaintiff would not have been exposed to unhealthy levels of PFAS, PFOS, and fluorochemicals.

245.    Defendants' failure to act with reasonable care to (1) design a product to perform safely; (2) failure to issue an adequate warning or instruction on the use of fluorochemical products warning and; (3) failure to issue a recall, were substantial factors in causing Plaintiff's harm.

246.    Defendants knew or reasonably should have known that users would not realize the danger Defendant's fluorochemical products posed to human health.

247.    A reasonable manufacturer or distributor under the same or similar circumstances would have warned of the danger.

248.    Defendants' negligent acts and omissions directly and proximately caused Plaintiff's illnesses alleged above, and continue to directly and proximately cause damage to Plaintiff in the form of severe personal injuries, pain, suffering, and emotional distress.

249.    Plaintiff is reasonably certain to have future permanent and lasting detrimental health effects due to Plaintiff's present and past injuries directly and proximately caused by Defendants' negligent acts or omissions.

250.    It has been reasonably foreseeable to Defendants for at least several decades that Defendants' negligent acts and/or omissions would directly and proximately cause bodily injury and economic damage to Plaintiff including the injuries and damages that Plaintiff suffers from.

251.    Defendants were conscious of the dangers of fluorochemical products, and its negligent acts or omissions, and were conscious that bodily injury to Plaintiff would or was likely to result from the fluorochemical products and Defendants' negligent acts and/or omissions. Nevertheless, with reckless indifference to these consequences, and as detailed herein, Defendants consciously and intentionally acted negligently and/or omitted the duties Defendants knew it owed to Plaintiff, other exposed individuals, and the public at large, and Plaintiff was harmed as a result.

252.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has suffered monetary losses and damages in amounts to be proven at trial.

## FOURTH CAUSE OF ACTION

### GROSS NEGLIGENCE

253.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

254.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, users, and/or marketers of AFFF, TOG, and fluorochemical products, the Defendants owed a duty to exercise reasonable care in the instructing, labeling, and warning of the handling, control, use and disposal of such chemicals, including a duty of care to ensure that their AFFF, TOG, and fluorochemical products did not expose Plaintiff to toxic PFOA and PFOS chemicals.

255.    Defendants owed a duty of care that was commensurate with the inherently dangerous, harmful and toxic nature of AFFF and fluorochemical products.

256.    Defendants failed to exercise ordinary care or diligence by acts and/or omissions that resulted in Plaintiff's exposure to Defendants' AFFF and fluorochemical products.

257.    Despite knowing that their AFFF and fluorochemical products are toxic, can contaminate soil and water sources, and present significant risks to human health and the

environment, Defendants breached their duty of reasonable care when they designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF and/or fluorochemical products.

258.     Defendants breached their duty of reasonable care when they intentionally issued inadequate instructions on how AFFF and fluorochemical products should be used and disposed of.

259.     Defendants breached their duty of reasonable care when they failed and refused to issue the appropriate warnings to the users of AFFF and fluorochemical products regarding the proper use and disposal of these product, notwithstanding the fact that the Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of its AFFF and/or fluorochemical products.

260.     Defendants were conscious of the dangers of AFFF and fluorochemical products and were conscious that bodily injury to Plaintiff would or was likely to result from the AFFF and fluorochemical products and Defendants' wrongful acts and/or omissions.

261.     Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training of users of, production of informational materials about, handling, use, and/or distribution of AFFF and fluorochemical products and/or other acts and/or omissions could likely result in Plaintiff's exposure to such chemicals and the subsequent physical harm suffered by Plaintiff.

262.     Defendants knew or reasonably should have known that people reasonably expected to come in contact with Defendants' AFFF and fluorochemical products or their derivatives and would not realize the danger Defendants' products posed to human health, including Plaintiff.

263. A reasonable manufacturer, seller, supplier, formulator, or distributor under the same or similar circumstances would have warned of the dangers.

264. Each of the aforementioned acts and/or omissions demonstrates Defendants' lack of scant care and total indifference to the safety of others, including Plaintiff.

265. Defendants' failure to act with the slightest reasonable care to (1) design a product to perform safety; and (2) issue an adequate warning or instruction on the use of products containing AFFF and fluorochemicals were substantial factors in causing Plaintiff's injuries and damages.

266. Defendants' grossly negligent conduct was the direct and proximate cause of the injuries, harm, and damages to Plaintiff as described herein.

267. Defendants' grossly negligent acts and/or omissions were a substantial factor in causing Plaintiff's exposure to unhealthy levels of AFFF and/or fluorochemical products, and subsequent harm.

268. Plaintiff is reasonably certain to have future permanent and lasting detrimental health effects due to Plaintiff's present and past injuries directly and proximately caused by Defendants' grossly negligent acts or omissions.

269. As a direct and proximate result of Defendants' grossly negligent conduct, Plaintiff has suffered and will continue to suffer damages, including medical and hospital bills, physical injury, economic damages, severe emotional distress, mental pain and suffering, loss of enjoyment, and other damages under the law and circumstances, which Plaintiff is entitled to recover.

## **FIFTH CAUSE OF ACTION**

### **BATTERY**

270.     Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

271.     At all relevant times, Defendants possessed knowledge that the AFFF, TOG, and fluorochemical products containing PFAS or PFOS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed were biopersistent, bioaccumulative, toxic, potentially carcinogenic, and/or otherwise harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiff having PFAS or PFOS in Plaintiff's blood or body, and the biopersistence and bioaccumulation of such chemicals in Plaintiff's blood or body.

272.     Defendants have known for several decades that their fluorochemical products are harmful and toxic to humans and animals, and once exposed, will remain in a person's body for a long time, including through binding to blood and/or tissues.

273.     Despite such knowledge, Defendants continued to use, manufacture, and sell these fluorochemical products, which caused harmful physical contact with Plaintiff.

274.     Defendants' continued actions with knowledge that such actions will result in harmful physical contact with Plaintiff demonstrate intent and/or reckless indifference by Defendants without regard to the harm they have caused and will cause.

275.     Defendants' intentional acts and/or omissions have resulted in fluorochemicals, in the body of Plaintiff or otherwise unlawful and harmful invasion, contact, and/or presence of fluorochemicals in Plaintiff's body, which interferes with Plaintiff's rightful use and possession of Plaintiff's body.

276. The fluorochemicals present in and/or on Plaintiff's body originating from Defendants' fluorochemical products was at all relevant times hereto, and continues to be, the property of Defendants.

277. The invasion and presence of the fluorochemical products in and/or on Plaintiff's body was and continues to be unconsented and without permission or authority from Plaintiff or anyone who could grant such permission or authority.

278. Defendants did not seek or obtain permission or consent from Plaintiff to put or allow PFAS or PFOS materials into Plaintiff's body, or to persist in and/or accumulate in Plaintiff's body.

279. Entry into, persistence in, and accumulation of such PFAS or PFOS in Plaintiff's body without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiff's person and unreasonably interferes with Plaintiff's rightful use and possession of Plaintiff's body.

280. Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with Plaintiff that resulted in persisting and accumulating levels of PFAS or PFOS in Plaintiff.

281. Plaintiff, and any reasonable person, would find the contact at issue harmful and/or offensive.

282. Defendants acted intentionally with the knowledge and/or belief that the contact, presence and/or invasion of PFAS or PFOS with, onto, and/or into Plaintiff, including its persistence and accumulation, was substantially certain to result from those very acts and/or omissions.

283.    Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiff's body.

284.    The continued presence, persistence, and accumulation of PFAS or PFOS in the body of Plaintiff is offensive, unreasonable, and/or harmful, and thereby constitutes a battery.

285.    Defendants' intentional acts and/or omissions were done with the knowledge and/or belief that the invasion, contact, and/or presence of fluorochemical products onto, and/or into Plaintiff's body were substantially certain to result from those acts and/or omissions.

286.    Harmful contact with Plaintiff's body was the direct and/or indirect result of Defendant's intentional acts and/or omissions.

287.    The presence and continuing presence of the fluorochemical products in and/or on Plaintiff's body is offensive, unreasonable, and/or harmful and constitutes a continuing and/or permanent trespass and battery.

288.    Defendants' past and continuing trespass and battery upon Plaintiff's body directly and proximately caused and continues to directly and proximately cause damage to Plaintiff in the form of bodily injury, for which Defendants are liable.

## SIXTH CAUSE OF ACTION

### FRAUDULENT CONCEALMENT

289.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

290.    At all times relevant to this Complaint, Defendants knew that their fluorochemical products were defective and unreasonably unsafe for their intended purpose.

291.    Defendants fraudulently concealed from and/or failed to disclose to or warn Plaintiff, and the public that their fluorochemical products were defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality.

292.    Defendants were under a duty to Plaintiff and the public to disclose and warn of the defective and harmful nature of their AFFF, TOG, and fluorochemical products because: (a) Defendants were in a superior position to know the true quality, safety and efficacy of Defendants' AFFF, TOG, and fluorochemical products; (b) Defendants knowingly made false claims about the safety and quality of Defendants' product in documents and marketing materials; and (c) Defendants fraudulently and affirmatively concealed the defective nature of Defendants' products from Plaintiff.

293.    The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase, use, and/or be exposed to Defendants' products.

294.    Because of Defendants' conduct and/or omissions, Plaintiff was prevented from discovering the truth about Defendants' AFFF, TOG, and fluorochemical products.

295.    Defendants knowingly, intentionally, maliciously, willfully, wantonly, recklessly, and/or negligently failed and/or refused to advise Plaintiff of the dangers and/or health risks posed by Defendants' AFFF, TOG, and fluorochemical products.

296.    Defendants negligently, knowingly, maliciously, willfully, wantonly, recklessly, intentionally, and/or negligently withheld, misrepresented, and/or concealed information regarding Defendants' AFFF, TOG, and fluorochemical products from Plaintiff, who had a right to know of information which would have prevented Plaintiff from being exposed and/or continuing to be exposed to the AFFF, TOG, and fluorochemical products.

297.    For at least several decades, Defendants had knowledge or the means of knowledge that Defendants' AFFF, TOG, and fluorochemical products were causally connected with or could increase the risk of causing damage to humans and animals, including knowledge of statistically significant findings showing a causal connection between exposure to AFFF, TOG, and fluorochemical products and physical injuries in humans and animals.

298.    In connection with the AFFF, TOG, and fluorochemical products, Defendants have had, and continue to have, a general duty of care to disclose to Plaintiff the actual and potential harm to Plaintiff as a direct and proximate result of Defendants' acts and/or omissions, including a general duty of care to disclose to Plaintiff that Defendants had, and were continuingly, exposing Plaintiff to harmful levels of AFFF, TOG, and fluorochemical products.

299.    In addition to its general duty of care, Defendants also voluntarily assumed a duty to disclose to Plaintiff the actual and potential harm to Plaintiff's body as a direct and proximate result of Defendants' acts and/or omissions, including a duty to disclose to Plaintiff that Defendants had exposed, and were continuingly exposing Plaintiff to harmful AFFF, TOG, and fluorochemical products, which duty was voluntarily assumed by affirmatively representing to Plaintiff and the public that Plaintiff's exposure was harmless, when Defendants knew and/or reasonably should have known that the Defendants' AFFF, TOG, and fluorochemical products caused, and were continuing to cause, bodily injury.

300.    Through Defendants' superior knowledge, responsibility, and/or control over the fluorochemical products, and Defendants' voluntary actions and/or representations, a relationship of trust and confidence existed between Defendants and Plaintiff.

301.    Despite Defendants' knowledge regarding fluorochemical exposure, and despite Defendants' duties to disclose to Plaintiff, Defendants negligently, maliciously, knowingly,

willfully, wantonly, recklessly and/or intentionally withheld, misrepresented, and/or concealed information from Plaintiff regarding Plaintiff's exposure to AFFF, TOG, and fluorochemical products.

302.     Defendants withheld, misrepresented, and/or concealed information regarding AFFF, TOG, and fluorochemical product exposure from Plaintiff with the intention to mislead and/or defraud Plaintiff into believing that Plaintiff's exposure was not harmful, and to mislead and/or defraud Plaintiff into continuing to be exposed to Defendants' AFFF, TOG, and fluorochemical products.

303.     Defendants withheld, misrepresented, and/or concealed information regarding AFFF, TOG, and fluorochemical product exposure that was a substantial factor in causing Plaintiff's harm.

304.     As a direct and proximate result of the aforesaid acts and/or omissions by Defendants, acting for and on its own behalf and as agent, ostensible agent, employee, conspirator and/or joint venture of others, Plaintiff was exposed to Defendants' AFFF, TOG, and fluorochemical products and was injured.

305.     Defendants not only withheld, misrepresented, and/or concealed material information from Plaintiff but also committed fraud against Plaintiff by affirmatively representing to Plaintiff that their AFFF, TOG, and fluorochemical products were harmless and/or did not present any risk of harm, when Defendants knew, reasonably should have known, and/or with utter disregard and recklessness as to whether it was true or not, that Defendants' AFFF, TOG, and fluorochemical products had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to Plaintiff.

306.    Defendants had, and continue to have, a duty of care to provide Plaintiff, with truthful representations regarding the actual and potential harm to Plaintiff as a direct and proximate result of Defendants' acts and/or omissions, and Defendants voluntarily assumed a duty of care to provide Plaintiff with truthful representations regarding Defendants' AFFF, TOG, and fluorochemical products and the actual and potential harm to Plaintiff as a direct and proximate result of Defendants' acts and/or omissions.

307.    Defendants' affirmative representations and/or omissions to Plaintiff were false and were material to Plaintiff in forming Plaintiff's belief that Defendants' AFFF, TOG, and fluorochemical products were safe, in causing Plaintiff to continue to be exposed to Defendants' AFFF, TOG, and fluorochemical products, and in causing Plaintiff to not seek treatment and/or ways to remedy Plaintiff's past and continuing exposure to AFFF, TOG, and fluorochemical products.

308.    Defendants made the affirmative representations and/or omissions to Plaintiff with the intention that Plaintiff would be misled into relying on such affirmative representations and/or omissions.

309.    Plaintiff relied on Defendants' affirmative representations and/or omissions in forming Plaintiff's belief that Defendants' AFFF, TOG, and fluorochemical products were safe in causing Plaintiff to continue to be exposed to Defendants' AFFF, TOG, and fluorochemical products, and in not seeking treatment and/or ways to remedy Plaintiff's past and continuing exposure to Defendants' AFFF, TOG, and fluorochemical products.

310.    Plaintiff was damaged and physically harmed as a direct and proximate result of Plaintiff's justified reliance on Defendants' affirmative, fraudulent representations and/or

omissions and, as a direct and proximate result of such justified reliance, Plaintiff continued to be

exposed to Defendants' AFFF, TOG, and fluorochemical products.

311.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless

indifference to the rights of Plaintiff and constituted intentional or grossly negligent conduct.

## SEVENTH CAUSE OF ACTION

## BREACH OF EXPRESS AND IMPLIED WARRANTIES

312.    Plaintiff incorporates herein by reference each and every paragraph of this

Complaint as though set forth in full in this cause of action.

313.    At all times relevant hereto, Defendants manufactured, marketed, labeled, and sold

the PFAS-containing products and/or AFFF-containing PFOA and/or PFOS that previously have

been alleged and described herein.

314.    At the time Defendants designed, developed, marketed, sold, labeled, and

distributed the PFAS-containing products and/or AFFF-containing PFOA and/or PFOS,

Defendants knew of the use for which it was intended, and impliedly and/or expressly warranted

that the products were merchantable, safe, and fit for their intended purposes.

315.    Defendants warranted that the product was merchantable and fit for the particular

purposes for which they were intended and would be reasonably safe. Defendants breached these

warranties, and such breaches proximately resulted in the injuries and damages suffered by

Plaintiff.

316.    Plaintiff is within the class of foreseeable users of Defendants' products and

reasonably relied upon Defendants' judgments, and the implied and/or express warranties in using

the products.

317.    Defendants breached their implied and/or express warranties and did not meet the expectations for the performance of their products when used for their intended purposes and were neither of merchantable quality, nor safe for their intended uses in that the products have a propensity to cause serious injury, pain, and cancer.

318.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has suffered monetary losses and damages in amounts to be proven at trial.

## EIGHTH CAUSE OF ACTION

### ACTUAL FRAUDULENT TRANSFER
### (Against DuPont and Chemours Co.)

319.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

320.    Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

321.    The Transfers and Assumed Liabilities were made for the benefit of DuPont.

322.    At the time that the Transfers were made and the Liabilities were assumed, and until the spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

323.    The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

324.    Plaintiff has been harmed and will be harmed as a result of the conduct of the Fraudulent Transfer Defendants.

325.    Plaintiff is entitled to void the Transfers and to recover property or value transferred to DuPont.

## NINTH CAUSE OF ACTION

## CONSTRUCTIVE FRAUDULENT TRANSFER
### (Against DuPont and Chemours Co.)

326.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

327.    Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

328.    Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

329.    At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

330.    The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

331.    Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers, or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

332.    At the time that the Transfers were made and Chemours Co. assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

333.    Plaintiff has been harmed and will be harmed as a result of the Transfers.

334.     Plaintiff is entitled to void the Transfers and to recover property or value transferred to DuPont.

## PUNITIVE DAMAGES

335.     Plaintiff hereby repeats, realleges, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

336.     At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the fluorochemical products that were used by Plaintiff and that resulted in the physical bodily injuries that Plaintiff has suffered and will continue to suffer.

337.     At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that their fluorochemical products were toxic chemicals capable of causing harm to human health.

338.     Defendants' negligent, reckless, willful, fraudulent, and/or wanton actions and/or intentional failures to act caused Plaintiff to be exposed to fluorochemical products.

339.     The willful, wanton, malicious, fraudulent and/or reckless conduct of Defendants, includes, but is not limited to:

        a.     issuing no warnings and failing to divulge material information concerning the release of fluorochemicals, including but not limited to PFOA and PFOS; failing to take all reasonable measures to ensure fluorochemical products would be used effectively and properly disposed of;

        b.     failing to prevent the foreseeable impacts of fluorochemical exposure upon the Plaintiff; and

c.      withholding, misrepresenting, and/or concealing information regarding the releases of fluorochemical products and exposure from Plaintiff, other exposed individuals, and the public at large with the intention to mislead and/or defraud them into believing that their exposure to fluorochemical products was not harmful, and to mislead and/or defraud them into continuing to purchase and consume drinking water contaminated with fluorochemical products.

340.    As a result of Defendants' conduct, Plaintiff has been forced to incur and will continue to incur significant costs related to the harm caused by Defendants' fluorochemical products and will continue to suffer serious, debilitating, and severe physical, mental, and emotional distress of Plaintiff's illnesses alleged above caused by Defendants' fluorochemical products.

341.    Defendants have demonstrated an outrageous conscious disregard for the physical safety of Plaintiff and acted with implied malice, warranting the imposition of punitive damages.

342.    Upon information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award the Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

### **Discovery Rule Tolling**

343.    Plaintiff, as a reasonable person, had no way of knowing about the risk of serious injury associated with the exposure to Defendants' PFAS-containing AFFF products until very recently.

344.    Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to PFAS-containing AFFF products is harmful to human health.

345.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to PFAS-containing AFFF products, nor would a reasonable and diligent investigation by Plaintiff have disclosed that PFAS-containing AFFF products could cause personal injury.

346.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**Fraudulent Concealment Tolling**

347.    All applicable statutes of limitations have also been tolled by Defendants' knowledge and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

348.    Instead of disclosing critical safety information regarding their PFAS containing AFFF products, Defendants have consistently and falsely represented the safety of their PFAS-containing AFFF products.

349.    This fraudulent concealment continues through the present day.

350.    Due to this fraudulent concealment, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**Estoppel**

351.    Defendants were under a continuous duty to consumers, end users, and other persons coming into contact with their products, including Plaintiff, to accurately provide safety information concerning its products and the risk associated with the use of and exposure to their PFAS-containing AFFF products.

352.     Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning PFAS-containing AFFF products and the serious risks associated with the use of and exposure to their PFAS-containing AFFF products.

353.     Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and requests the following relief from the Court:

A.     Compensatory damages that exceed the jurisdictional limit of this court;

B.     Punitive damages that exceed the jurisdictional limit of this court;

C.     Reasonable fees for attorneys and expert witnesses;

D.     Costs and disbursements of this lawsuit;

E.     Interest on the damages according to law; and

F.     Any other and further relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

**OUTREACH LEGAL**

*/s/ Paul P. Burghardt*

PAUL P. BURGHARDT
*Attorney for Plaintiff*